UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                      Case No. 18-cr-120-pp

JORDAN A. KUBASIAK,

    Defendant.

---

**ORDER OVERRULING DEFENDANT'S OBJECTION TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION (DKT. NO. 40), ADOPTING REPORT AND RECOMMENDATION (DKT. NO. 39) AND DENYING DEFENDANT'S MOTION TO SUPPRESS (DKT. NO. 31)**

---

The defendant moved to suppress evidence, arguing that video surveillance from his neighbor's video camera constituted a warrantless search violating the Fourth Amendment. Dkt. No. 31. The defendant did not request an evidentiary hearing on the motion; he provided the court with a Google map aerial photo of his neighborhood and a copy of the search warrant that referenced the surveillance. Dkt. No. 31-1. Magistrate Judge Joseph issued a report, recommending that this court deny the motion. Dkt. No. 39. The defendant's brief objection to that recommendation "preserves the issue for appeal whether the warrantless surveillance in this case was a search implicating a reasonable expectation of privacy." Dkt. No. 40. The court will adopt the recommendation, overrule the objection and deny the motion to suppress.

1

I.  **Background**

   A.  Video Surveillance

The defendant's motion to suppress stated that "[a]t some point during October 2017, the Wisconsin Department of Justice, Criminal Division, installed cameras to monitor [the defendant's residence], 208 S. Judge Dr. in Saukville, WI." Dkt. No. 31 at 1. The officers placed one of the cameras inside the home of the defendant's neighbor, "whose house is directly behind Kabasiak's at 229 S. Claremont Rd." Id. The camera faced toward the defendant's home, "and captured the view of his back yard." Id. The defendant provided the court with a Google maps satellite view his residence. Dkt. No. 31-1. In a footnote referencing the map, the defendant asserted that his "yard is partially fenced in (on the south side), and otherwise lined with shrubs or trees (on the east and north), and the home and garage obstruct view of the back yard from the front of the home." Dkt. No. 31 at 1, n.1. "In other words, the yard would not be observable by a casual passerby." Id.

The government does not appear to have contested these facts; in its response, it stated only that the defendant's motion "fail[ed] to establish how or why the surveillance camera was installed or provide any facts from which the court can find that either its installation or the resulting video constitute[d] an unreasonable search." Dkt. No. 32 at 2.

   B.  Procedural History

On June 5, 2018, a grand jury returned a one-count indictment against the defendant, charging him with arson to a building used in interstate commerce. Dkt. No. 1. The week before the deadline for filing pretrial motions was to expire, the defendant moved for extension of time to file pretrial motions. Dkt. No. 23. Judge Joseph granted the motion, and extended the deadline to July 25, 2018; the defendant timely filed his motion to suppress the fruits of the surveillance video. Dkt. No. 31.

In the motion, the defendant argued that the surveillance footage of his backyard taken from the camera installed at his neighbor's home infringed his expectation of privacy in the activities viewable by the camera. Id. at 3. In addition, the defendant argued that the duration of the surveillance (four months) further "exacerbate[d] law enforcement's intrusion into that private domain." Id. In support of these arguments, he cited two Supreme Court cases—United States v. Jones, 565 U.S. 400, 414-415 (2012) and Carpenter v. United States, ___ U.S. ___, 138 S. Ct. 2206, 2216 (2018).

The government responded that the defendant had not provided any legal analysis to show how the two Supreme Court cases he'd cited supported his arguments. Dkt. No. 32 at 2. In reply, the defendant argued that it was not his burden to lay the foundation for evidence that the government intended to use at trial. Id. at 2. Nonetheless, he provided the court with a copy of a search warrant he'd received from the government in discovery, which indicated that law enforcement had installed the camera as part of their investigation of an October 2017 garage fire, in which the defendant was a potential suspect. Id.

3

The excerpt of the warrant quoted in the reply brief indicated that the camera, which monitored "the rear of [the defendant's] residence/garage," had "found no activity consistent with [the defendant] returning home around 920pm." Id. The camera footage did reflect "that at 9:52pm a sweep of lights entered the camera view, which would be consistent with a vehicle pulling into [the defendant's] driveway and several minutes later persons were observed in the backyard area." Dkt. No. 38-1 at 5, ¶24.

The defendant's reply brief contained a more detailed analysis of Jones and Carpenter, as well as discussion of two other decisions, Oliver v. United States, 466 U.S. 170, 180 (1984) and United States v. Dunn, 480 U.S. 294, 301 (1987).

Judge Joseph issued her report and recommendation on August 23, 2018. Dkt. No. 39. She relied on the brief facts the defendant had stated in his motion. Id. at 1-2. After discussing the Fourth Amendment case law governing searches and a person's reasonable expectation of privacy, Judge Joseph rejected the defendant's argument that the surveillance violated his reasonable expectation of privacy in the curtilage of his home. Id. at 3. She concluded that the defendant had failed to support his motion with any evidence on which Judge Joseph could find that the video camera captured anything that was not exposed to public view. Id. She pointed out that the only evidence the defendant had provided was the Google map photo, which did not provide any information about things like the height of the fence, what a passerby could see from the street, the capabilities of the surveillance camera ("whether the

camera could zoom, record audio, record in color etc."), or what one could see from the neighbor's property. Id. at 4.

Judge Joseph acknowledged that in Jones and Carpenter, the Supreme Court had "expressed concerns about the evolving reach of technology in law enforcement surveillance and the aggregate information emerging technologies allow the government to collect." Id. at 5. She pointed out, however, that neither case addressed surveillance from a video camera mounted on a neighbor's property. Id. Indeed, Judge Joseph concluded that the technology involved in the defendant's case—a video camera—was "rather low technology, conventional surveillance, compared to the GPS in *Jones* and cell phones in *Carpenter*." Id. She observed that in Carpenter, the Supreme Court had emphasized that it did not call into question conventional surveillance techniques and tools, such as security cameras. Id. at 6. Judge Joseph also noted that she could not locate any Seventh Circuit authority that supported the mosaic or aggregate theory asserted by the defendant. Id. Finally, she pointed to the Supreme Court's holding "that police may use technology to enhance or substitute for surveillance what they could lawfully conduct themselves." Id. (citing United States v. Knotts, 460 U.S. 276, 282 (1983)).

On September 6, 2018, the defendant filed a timely objection to Judge Joseph's report and recommendation. Dkt. No. 40. In its entirety, the objection stated,

> Jordan Kubasiak objects to the Magistrate Judge's Recommendation to deny his motion to suppress the fruits of the surveillance camera recording his back yard for several months. Given the evolving nature of technology and its

5

> interplay with Fourth Amendment protections, Kubasiak preserves the issue for appeal whether the warrantless surveillance in this case was a search implicating a reasonable expectation of privacy.

Id. at 1.

The government's response began by pointing out that a district court must review *de novo* a magistrate judge's ruling on a dispositive motion to the extent that the defendant has filed specific written objections to the proposed findings and recommendation. Dkt. No. 42 at 6-7. The government argued that the defendant's cursory, one-paragraph objection did not meet that standard. Id. at 7. The government further argued that Judge Joseph's analysis of the cases the defendant had cited was correct, and that her distinction between GPS and cell site location information technology and a surveillance camera was of critical relevance. Id. The government also pointed to several decisions where courts had analyzed the Fourth Amendment implications of a more analogous technology—pole cameras—and had found that that technology did not violate the Fourth Amendment. Id. at 8.

The final pretrial conference is scheduled for October 10, 2018 at 1:30 p.m., and the trial will begin October 15, 2018 at 8:30 a.m.

**II. Analysis**

    A.    <u>Standard of Review</u>

Federal Rule of Criminal Procedure 59(b) governs dispositive motion practice initiated before magistrate judges. Parties have fourteen days to file "specific written objections" to a magistrate judge's report and recommendation on a dispositive motion. Fed. R. Crim. P. 59(b)(2). When reviewing a

6

magistrate's recommendation, the district judge reviews *de novo* the recommendations of the magistrate judge to which a party timely objects. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(2), (3). The court can "accept, reject, or modify, in whole or in part, the findings or the recommendations made by the magistrate." 28 U.S.C. § 636(b)(1).

B. Discussion

The defendant filed a one-paragraph, general objection to the report and recommendation. Dkt. No. 40. In that paragraph, defense counsel indicated that he was preserving for appeal the question of whether "the warrantless surveillance in this case was a search implicating a reasonable expectation of privacy." Id. This is not the specific written objection contemplated by Rule 59(b)(2). The defendant did not identify any factual findings with which he disagreed; he could hardly do so, given that Judge Joseph relied on his own (brief and cursory) facts. Nor did he identify which of the several legal bases Judge Joseph provided he challenged. Despite that fact, the court will review Judge Joseph's entire decision *de novo*.

"The Fourth Amendment protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Carpenter, 138 S. Ct. at 2213. "For much of our history, Fourth Amendment search doctrine was 'tied to common-law trespass' and focused on whether the Government 'obtains information by physically intruding on a constitutionally protected area.'" Id. (quoting Jones, 565 U.S. at 406 n.3). Over time, the Supreme Court began to recognize that 'property rights are not the

sole measure of Fourth Amendment violations," id. (quoting Soldal v. Cook C'nty, 506 U.S. 56, 64 (1991)), and held that "the Fourth Amendment protects people, not places," id. (quoting Katz v. United States, 389 U.S. 347, 351 (1967)). When an individual "'seeks to preserve something as private,' and his expectation of privacy is 'one that society is prepared to recognize as reasonable,' [the Supreme Court] has held that official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause." Id. (citing Smith v. Maryland, 442 U.S. 735, 740 (1979)).

In the motion to suppress, the defendant argued that he had "a reasonable expectation of privacy in his back yard," and that he had a reasonable expectation of privacy "in the 'aggregate' of his activities viewable within that area throughout the surveillance period." Dkt. No. 31 at 2. He argued that the collection of surveillance footage "infringed upon [his] expectation of privacy in his historical record of activities viewable by the camera recording his back yard." Id. at 2-3. The Supreme Court has explained that "[t]he Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares." California v. Ciraolo, 476 U.S. 207, 213 (1986). "Nor does the mere fact that an individual has taken measures to restrict some view of his activities preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible." Id. (citing cases).

Judge Joseph rightly noted that the Google map photo the defendant submitted with his motion provides little information about what a law enforcement officer might have been able to see of the defendant's back yard when passing by on a public thoroughfare, or what that officer might have observed from a public vantage point where he had a right to be. The motion indicated that the camera was inside the house "directly behind [the defendant's] at 229 S. Claremont Rd." Dkt. No. 31 at 1. The Google map shows that between the house where the camera was installed and the defendant's back yard, there are two or three large trees (in the neighbor's back yard), three shrubs or bushes (dividing the two back yards from each other) and one large tree (at the corner of the defendant's garage). Dkt. No. 31-1. The trees in the neighbor's yard appear to be between the neighbor's garage and the defendant's back yard; for the most part, it does not appear that they block the view from the neighbor's house into the back yard. It is impossible to tell the height of the shrubs/bushes/trees that divide the two yards, although from the shadows they cast, they appear to be much shorter than the trees. The tree in the defendant's back yard appears to block part of the view from the neighbor's house to the defendant's garage and to part of the defendant's *house*, but depending on where the camera was set up in the neighbor's house, it would not necessarily block all views of the back yard. It appears that a law enforcement officer standing on the sidewalk in front of the defendant's house and to the left (when facing the house) would be able to see into part of the back yard with the naked eye. It also appears that a law enforcement officer

9

standing in the *neighbor's* yard would be able to see most of the back yard with the naked eye: there are spaces between the bushes/shrubs and trees that divide the two properties.

These facts contradict the defendant's claim that he had a reasonable expectation of privacy in the back yard. In support of his assertion that he did have such a reasonable expectation, the defendant cited United States v. Cuevas-Sanchez, 821 F.2d 248, 251 (5th Cir. 1987). Dkt. No. 31 at 2. In that case, police mounted a surveillance camera on "a power pole overlooking the appellant's 10-foot-high fence bordering the back of the yard." Id. at 250. The Fifth Circuit concluded that the defendant had an expectation to be free from that kind of video surveillance in his back yard, and that society was willing to recognize that expectation as reasonable. Id. at 251.

The defendant's reliance on Cuevas-Sanchez is misplaced. First, the decision is not binding on courts in the Seventh Circuit. Second, the defendant in that case had a ten-foot high fence which arguably would have prevented passersby from seeing into the yard from a public thoroughfare or vantage point. Third, as the court discusses below, it is not clear that the Fifth Circuit's 1987 decision in Cuevas-Sanchez would withstand scrutiny under the law as it has developed over the thirty years since.

In his reply brief in support of the motion, the defendant raised a technology argument for the first time. He asserted that twenty-four-hour, months-long surveillance technology "reveals patterns and activities beyond merely looking at someone's home while passing by . . . ." Dkt. No. 38 at 3. He

also asserted in his objection to Judge Joseph's report and recommendation that "[g]iven the evolving nature of technology and its interplay with Fourth Amendment protections," he was trying to preserve his arguments for appeal. Dkt. No. 40.

It is true that, "[a]s technology has enhanced the Government's capacity to encroach upon areas normally guarded from inquisitive eyes, [the Supreme] Court has sought to 'assure [] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted.'" Carpenter, 138 S. Ct. at 2214 (quoting Kyllo v. United States, 533 U.S. 27, 34 (2001)). Fourth Amendment jurisprudence has evolved as technology has evolved. For example, in Kyllo, the Supreme Court held that a thermal imager used to detect heat radiating from the side of a home was a search under the Fourth Amendment and required a warrant. Kyllo, 533 U.S. at 34. The Court reasoned that the government could not have obtained the information without physical intrusion into a constitutional protected area. Id. More recently, the Supreme Court held that the government's use of a GPS tracking device attached to a vehicle registered to the defendant's wife constituted a search for Fourth Amendment purposes. Jones, 565 U.S. at 404. Three months ago, the Supreme Court held that the government's acquisition of cell-site location information (CSLI) violated the Fourth Amendment. Carpenter, 138 S. Ct. at 2217. The Court reasoned that mapping a cell phone's location over the course of 127 days provided an "intimate window into a person's life, revealing not only his particular movements, but through them his 'familial, political,

professional, religious, and sexual associations.'" Id. (quoting Jones, 565 U.S. at 415). The Court explained that its decision was a "narrow one" that did not call into question "conventional surveillance techniques and tools, such as security cameras." Id., 128 S. Ct. at 2220.

As Judge Joseph found, however, the video camera surveillance that law enforcement employed in the defendant's case was less advanced than a GPS device or the technology that maps CSLI. As Judge Adelman has recently noted, "ordinary video cameras . . . have been around for decades." United States v. Kay, Case No. 17-cr-16, 2018 WL 3995902, *3 (E.D. Wis. Aug. 21, 2018) (quoting United States v. Tuggle, Case No. 16-cr-20070, 2018 WL 3631881, at *3 (C.D. Ill. July 31, 2018)). Even if mounted on a pole, video cameras are "limited to a fixed location and capture only activities in camera view, as opposed to GPS, which can track an individual's movement anywhere in the world." Id.

Judge Joseph also noted that the defendant had provided no information about whether the camera that surveilled his back yard had enhanced technological capabilities—whether it could zoom in, or record audio. If the defendant had provided information showing that the camera could zoom in, or record audio, or capture infrared, or allow the officers to see *inside* the defendant's house, the defendant's "evolving technology" argument might have more influence. See United States v. Tirado, Case No. 16-cr-168, 2018 WL 1806056, *3 (E.D. Wis. Apr. 16, 2018); but see, Knotts, 260 U.S. at 282 ("nothing in the Fourth Amendment prohibited the police from augmenting the

sensory faculties bestowed upon them at birth with such enhancement as science and technology afforded them . . . ."). But the defendant's implication that a stationary video camera is some form of advanced technology that requires an evolved view of Fourth Amendment jurisprudence has no merit.

The issue is not whether a video camera is a piece of technology that allows law enforcement to see into places where defendants have a reasonable expectation of privacy. A video camera—assuming no enhanced capabilities—can see only what the officer can see. If the camera is in a place where the officer lawfully could have been, then it does nothing more than see what the officer could have seen. If the neighbor had allowed law enforcement to sit in the house and look out the window twenty-four hours a day for several months, they could have done so without violating the Fourth Amendment, because the surveilling officers would have been observing from a vantage point where they had a right to be, and would have been observing that which was clearly visible.

What a video camera can do that law enforcement officers cannot is to "observe" for extended periods at relatively little cost. The defendant's core argument appears to relate to this fact—to the fact that, by using a video camera to surveil his back yard, law enforcement was able to monitor every single event that took place in his back yard for a long time. This is his "aggregate," or "mosaic," argument. He points first to the concurrence in Jones, authored by Justice Alito and joined by Justices Ginsberg, Breyer and Kagan. In that concurrence, Justice Alito wrote:

13

> . . . [R]elatively short-term monitoring of a person's movements on public streets accords with expectations of privacy that our society has recognized as reasonable. But the use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy. For such offenses, society's expectation has been that law enforcement agents and others would not— and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual's care for a very long period. In this case, for four weeks, law enforcement agents tracked every movement the respondent made in the vehicle he was driving.

Jones, 565 U.S. at 430. The concurring authors concluded that this ability to track a person's every movement over a long period of time, unanticipated by society, constituted a search under the Fourth Amendment. Id. at 431.

The defendant also pointed to the Supreme Court's decision in Carpenter, where it had to apply the Fourth Amendment "to a new phenomenon: the ability to chronicle a person's past movements through the record of his cell phone signals." Carpenter, 138 S. Ct. 2216. In concluding that accessing a person's cell phone data through cell-site location information violated that person's reasonable expectation of privacy, the Court reasoned that cell phones "faithfully follow[] [their] owner[s] beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales." Id. at 2218. For this reason,

> [m]aping a cell phone's location over the course of 127 days provides an all-encompassing record of the holder's whereabouts. As with GPS information, the time-stamped data provides an intimate window into a person's life, revealing not only his particular movements, but through them his "familial, political, professional, religious, and sexual associations." These location records "hold for many Americans the 'privacies of life.'" And like GPS monitoring, cell phone tracking is remarkably easy, cheap, and efficient compared to traditional investigative tools. With just the click of a button, the Government can access each carrier's

> deep repository of historical information at practically no expense.

Id. at 2217.

The defendant employs this reasoning to assert that using a video camera to record a person's back yard for twenty-four hours a day over several months violates that person's reasonable expectation of privacy. This argument ignores a critical element of the Supreme Court's reasoning in Jones and Carpenter.

Because the surveillance camera was fixed, it could observe the defendant in only one location—his back yard. It could not track him around the neighborhood. It could not follow him into his doctor's office, or a political headquarters, or a place of worship. It could not follow him inside his home (a place where he had a reasonable expectation of privacy). Even for twenty-four hours a day over several months, it could "observe" the defendant only when he was in his backyard, within view of the camera. It might, in that process, capture certain information about the defendant. If he was in the back yard with other people, it would observe those people, and thus provide information about with whom the defendant associated. If he was doing something in his back yard that he would have preferred other people not to see, it would have captured that activity. But the defendant's neighbor, or a law enforcement officer standing in the neighbor's house, would have been able to see those some things, without a video camera.

Other courts have considered the argument the defendant is making in the context of pole cameras, and have rejected it. Tirado, 2018 WL 1806056, at

\*4 (citing United States v. Houston, 813 F.3d 282, 285 (6th Cir. 2016); United States v. Bucci, 582 F.3d 108, 116-17 (1st Cir. 2009); United States v. Jackson, 213 F.3d 1269, 1281 (10th Cir. 2000)). Judge Adelman himself has rejected the argument in two recent cases. In United States v. Kay, Judge Adelman rejected the defendant's argument that because pole cameras allowed constant surveillance over an extended time, their use violated the Fourth Amendment. 2018 WL 3995902 at \*3. Pointing out that pole cameras were fixed, and recorded only activities in their view, he concluded that "[p]ole camera surveillance is thus unlikely to provide the same 'intimate window' into the person's life, revealing his 'political, professional, religious, and sexual associations.'" Id. (quoting Carpenter, 138 S.Ct. at 2217).

Similarly, in denying the defendants' motion to reconsider his denial of their motion to suppress in Tirado, Judge Adelman noted that the defendants had failed to demonstrate "how [pole camera] surveillance provides the same aggregate account of a person's life" as the one the Supreme Court had described in Carpenter. United States v. Tirado, Case No. 16-cr-168, 2018 WL 3995901, \*2 (E.D. Wis. Aug. 21, 2018) (citations omitted). Because it was "undisputed that the cameras" used in Tirado "did not record events inside the homes or otherwise permit the police to see things an officer standing on the street could not see," Judge Adelman denied the defendants' motion to reconsider his denial of their motion to suppress. Id.

The same analysis applies here. The camera in the neighbor's house was in a fixed location, and recorded only what the neighbor, or a police officer

16

standing in the neighbor's house, could have seen. The surveillance did not present the kind of aggregate view of intimate details of the defendant's every movement that concerned the concurrence in Jones, or the majority in Carpenter.

Finally, in his reply brief in support of the motion to suppress, the defendant argued that his back yard was "curtilage," which he argued meant that he had an automatic reasonable expectation of privacy there. In support of this assertion, he cited United States v. Dunn, 480 U.S. 294, 301 (1987). In Dunn, the Supreme Court noted that the concept of "curtilage" originated "at common law to extend to the area immediately surrounding a dwelling house the same protection under the law of burglary as was afforded the house itself." Id. at 300. The Court noted that it previously had held that the Fourth Amendment "protects the curtilage of a house and that the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." Id. (citing Oliver, 466 U.S. at 180). It laid out a four-factor test for courts to use to determine the extent of a home's curtilage: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." Id. at 301 (citations omitted).

The defendant asserted in his response that his back yard met all these requirements: "it is immediately proximate to his home; is fenced on one side,

lined with trees on two others, and obstructed from street view by the home and garage; would only be accessible or used by residents of the home; and (as with the second factor) is surrounded on each side by something obstructing visibility." Dkt. No. 38 at 3 n.1.

The court has dealt with this argument in its discussion of whether the defendant had a reasonable expectation of privacy in his back yard. The defendant argues that his back yard meets the definition of curtilage, but the only evidence he provided in support of that assertion was the Google map. From what the court can tell of that map, it either does not support the defendant's assertions, or does not contain information sufficient to allow the court to make a conclusion one way or the other. The court already has noted that it appears that one can see parts of the defendant's back yard from the sidewalk in front of his house, and from the neighbor's house. The map does show a fence to the right of the defendant's house (when one is facing the house), but gives no indication of the height of that fence, or whether someone on the other side could see over it. The court has noted that the map provides no information about the height of the shrubs or bushes dividing the two yards. It appears that the yard is accessible to people other than the residents—someone could walk from the sidewalk along the left-hand side of the house into the yard, or walk between the bushes from the neighbor's back yard to the defendant's. The map does not show an enclosure around the entire back yard. The record is silent as to the uses to which the back yard is put, or to any steps the defendant may have taken to protect it from view.

For all of these reasons, the court will adopt Judge Joseph's report and recommendation, and will deny the defendant's motion to suppress.

## III. Conclusion

The court **OVERRULES** the defendant's objection to Magistrate Judge Joseph's report and recommendation. Dkt. No. 40.

The court **ADOPTS** Judge Joseph's report and recommendation. Dkt. No. 39.

The court **DENIES** the defendant's motion to suppress. Dkt. No. 31.

Dated in Milwaukee, Wisconsin this 5th day of October, 2018.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER**
**United States District Judge**